Pedro Hernandez, Mr. Discant. Good morning. Good morning, Your Honor. I may have pleased the Court. My name is Edward Discant. I represented Petitioner Pedro Hernandez below and on appeal. Your Honors, this case hinged on the asserted confessions of Pedro Hernandez, an intellectually impaired, highly suggestible man who suffers from mental illness. There was no other evidence in this case. And I would submit that as the Court approaches the error on appeal, there are two critical issues for the Court to focus on. The first is that in a New York State Court trial, the issue of the voluntariness of a confession is properly before a jury. Not only was this jury instructed on voluntariness, but the voluntariness of Mr. Hernandez's statements was a focal point of the defense and a focal point of the defense summation. The second and related point is that as a result, the jury was entitled to and, in fact, did hear all of the deeply troubling evidence about the manner in which those statements were obtained. The fact that Mr. Hernandez was picked up by five police cars. They took his phone, his wallet, his medication. They took him to a police station where they held him in an eight-by-ten windowless room. They did not prize him of his rights. They did not provide him counsel. Did you ever argue, was it you? At trial, no. At trial, but okay. So did the lawyers ever argue to the jury that the failure to give Mr. Hernandez Miranda warnings was part of an attempt, a deliberate attempt to avoid Miranda? I'm not sure they put it quite that way, Your Honor. They certainly argued that there was an intentional decision not to give Miranda warnings and that that went to the voluntariness of the statement. And I would direct the court to A. 1139 through 49 of the record, which is where defense counsel summed up on this very point. Certainly the issue of the voluntariness and the fact that he hadn't been warned was before the jury and it allowed the jury to consider and it invited the jury to consider whether or not to give those statements credit, which is why when the jury came back, having heard the evidence about the deeply troubling manner in which these statements were obtained, which Judge Lea, to your question, would have included evidence that the recording device was intentionally not turned on, that is there was an intentional decision not to use it, that they ignored statements like, I want to go home and I am here against my will, that at one point Mr. Hernandez is curled up in the fetal position on the floor and yet they keep going. Was he allowed to sleep? That's the part that's not clear in the record. So Your Honor, he was allowed a brief period of sleep, but that was actually different. There's a seven-hour window in which he is interrogated. That's what prompts the first asserted confession. They then move him to the DA's office where the questioning continues. He's given a brief period of time to rest and then the questioning resumes at 7 a.m. But the entire sequence of events happens in a little under 24 hours. So we're not talking about a meaningful amount of rest. But it was on that record that the jury came back and asked the trial court to explain whether if it found the initial unworn confession to be involuntary, it must disregard the two videotaped confessions that followed. Federal law provides an answer to that question and that answer is not no. That answer is maybe. That is very clearly established federal law. It was raised to the trial court. So while the parties were deliberating about that issue, how to answer that note, did defense counsel provide maybe as an answer? Yes, Your Honor. Because I thought that defense counsel provided yes as the answer and then backtracked a little bit, but it was never maybe. Well, Your Honor, the specific request that was given by defense counsel started with And I'll note, by the way, that on appeal, excuse me, on habeas, the people effectively conceded that yes was correct as to the first video recorded statement. But they then backtracked to you should tell them at the very least that it's up to them, which is in fact maybe. That is to invite the jury to consider whether or not they were going to choose to disregard. So he said that you could do that. Now here is my question. The state court found that this was not fundamental error. And on that, we have to give them a difference. But you say that is clear law. My next question is the state court also said that this was harmless. That's a second question. My question is, was the state's court statement that this was harmless dependent in part on their finding that this was not error or was it a totally independent finding? So that's a great question, Your Honor. I think the way this court should approach them is independent findings. And the reason I would say that is that the deference owed by this court is very different as to the first issue, that is whether or not there is a constitutional error, which is before this court de novo, as opposed to harmlessness, which Your Honor is of course correct, ADPA requires deference to. It's the second finding that stumbled or posed a pediment below to Judge McMahon. And that's of course because under Brown, there are the two levels of distinct review that this court needs to go through. Yes, but you see, I would not argue that position you're taking. I would argue the opposite one because there's a question of whether we have to give ADPA deference to the state court finding as to harmlessness. And if that was based, as I would have thought it was, in part on their original error, then that finding is not owed ADPA deference by us because it was a finding based on an error. If we find that the first one was wrong, even under ADPA, then if the second depends on it, then we don't need to give ADPA deference to it. We then have to decide on our own whether we do under Brown both things or not. But how much deference we give to the state depends in part on whether what the state found with respect to harmlessness is flawed by something that we can say is wrong. So certainly if Your Honor is prepared to rule on that ground, we would encourage the court to do so. I have no disagreement with that. The point I was making is that even in the alternative, even in the universe in which the court were to find that ADPA deference is owed on the issue of harmlessness, you can overcome that. And the reason you can overcome that is I would submit to you this is actually the unusual case in which ADPA deference is a lower bar than Brecht because under ADPA deference on this fact, the issue for this court is whether every fair-minded jurist applying the standard correctly, that is the Chapman standard correctly, would find the error prejudicial. And I would submit to you that they would because Chapman places the burden on the people. Unlike Brecht where the burden is on the petitioner to show harm, under Chapman it is the people's burden to show beyond a reasonable doubt that the error was not harmless. The people can't meet that burden. They couldn't possibly meet that burden. They have never tried to meet that burden. And the first, the appellate division didn't correctly cite it, which is a different level of error, Judge Calabresi, that I would suggest to you does weigh a limited form of deference on that finding in particular. With that, I see my time has expired. I'm certainly happy to keep answering questions. Does his mental capacity have any effect on how we understand Siebert and the consideration of his confession? So it's a great question, Your Honor. I think it certainly has to do with voluntariness because, again, the issue before the jury was voluntariness, which obviously Siebert goes to, right? What Siebert is concerned about, the concern with the two-step interrogation question, is that it undercuts the voluntariness of the waiver the second time around, right? Here, the mental capacity of the defendant is certainly something that the jury was entitled to consider in considering whether or not the quote-unquote waiver that occurred before the video recorded statements was voluntary. So I would answer yes. I do have another question that may seem irrelevant, but that is, during all the time between the disappearance of the little boy and when your client was charged, has he committed other crimes that were irrelevant, but did he do anything, any crimes of any sort? Certainly none of violence that I'm aware of, Your Honor. Your Honor alluded to the prior quote-unquote statements of involvement in violence. None of those, of course, had anything to do with Eighten Pates, but more importantly, no one found them credible, right? This is a person who suffers from severe hallucinations, who is very impressionable. The people around him knew that. The testimony at trial was that none of the people who heard those statements took them particularly seriously. So am I right just to pick up on a question that was posed earlier? The appellate division says, assuming without deciding that there was some error with respect to the first part, then we would find or we would still determine that the error was harmless. Is that correct? I believe that's correct, Your Honor. I can double-check that in a moment. I believe that's the way that they address it. It's not that. And then, so one other argument that is made by the people is that you have all of these other confessions that are not the subject of cyber. The confessions to private parties, for example, well, in particular, both preceding the confession at issue and following to medical providers and so on. How do we assess that? What do we do about that? Because it seems to me that that is not the subject of cyber. I mean, maybe that's what the jury was thinking about, but in connection with the question that's precisely before us, which is whether the answer no was a violation of cyber and therefore posed a problem as a matter of habeas in EPA, what do we make of that? So in essence, the answer no is correct because the question was linked by an and, not an or. Do you understand the question? Yes, Your Honor. And to start where you ended, I would respectfully submit... Hold on one second, Mr. Diskant. You've got more fans. Yeah, many of us welcome you. Please proceed. Thank you, Your Honor. So starting where you ended, I would submit the answer to the question is still maybe because it does ask about both, right? The note is asking both about the video recorded statements, which would be subject to CBERT, and the additional statements. But with respect to the additional statements, the additional statements did not individually or collectively amount to the evidentiary force of the recorded ones. You don't need to take my word for that. Look at the way the people tried the case. The people played the two video recorded statements over and over, essentially on loop during the trial. During summation alone, they played those clips seven times or more. By contrast, none of the other statements, one were recorded, nor two did they bear any of the sort of hallmarks of reliability that would lead a jury to rely on them. So for example, Ramon Rodriguez testified that in 1979, Hernandez told him that an unnamed kid was stabbed with a pointy stick. Nothing to do with the people's theory of the case. Mark Pike in the early 80s said that Hernandez said a black kid threw a ball at him. Again, clearly not Eaton Pates. Daisy Rivera, his ex-wife, said that a muchacho had violated him. And then the statements that follow, which are primarily statements to treating physicians, both the nurse at Bellevue and then the accompanying psychiatrist, are neither particularly specific, or they are accompanied by statements that are condis— Well, what about the fact that he takes them to the precise location? And the only issue there—well, maybe I've got this wrong, but this is my reading, so you're going to have to appreciate that. And then the only issue is that he says, I don't remember a door there, but then I think it comes to evidence that a door was subsequently, well, after the murder, placed. Yeah, so, I mean, I don't think there's any dispute that Mr. Hernandez was familiar with the location. He had worked at the bodega, right? So the fact that he's— That's all you can draw from that. What's that? That's all you can draw from that. Well, it's the most a jury could draw from that, right? I mean, I think where this would come up in the context of habeas review is under Brecht and equally under Edba, because Chapman incorporates the same analysis. The court typically looks at the strength or the weakness of the people's case. And here I would submit that much as was the case in Woodby or Cole or Ray V. Johnson, you know, there is some other evidence. There was some other evidence in those two cases. Are you also arguing that these other confessions, which were clearly wrong or irrelevant, actually acted in favor of your client's case because they made the confessions dubious, if he was making several of them, and therefore more required an answer that said maybe rather than no, so that to the extent that the other confessions were part of it, that actually is something that an answer that would say you may consider them would cut in your favor. That's exactly right, Judge Calabresi. And that is in fact the way the defense counsel argued it at trial, is that he pointed to the prior statements as further evidence that Mr. Hernandez was not well and subject to hallucinations. You know, just to finish the The statements that follow, the statements to the psychiatrist are accompanied by things like Pedro Hernandez telling his own expert that he remembered there being clowns there and other children. I mean, the sorts of things that would go to the reliability of the statements. But it was also a mistrial. That's exactly right. So what happened there? So the first jury hung, and the second jury spent nine days deliberating. They sent out three different notes focused on this testimony. This goes to the people's frankly incredible claim that there was overwhelming evidence, and it is part of the same harmless error analysis, right? Because under this court's precedent, whether evaluating Brecht or evaluating AEDPA, you look at the importance of the evidence to the case, and here I don't think there can be any serious dispute that this was essential evidence. But two, you look at the strength of the remaining case, and here the strength of the remaining case was exceedingly weak. Because even if you assume that the jury would not have applied a seabird instruction to the previous statements to folks in the 80s or to the treating physicians, those statements individually and collectively, as Judge Calabresi noted, would if anything further underscore the fact that Mr. Hernandez had serious mental health issues as opposed to suggesting that he was a murderer. Your colleague's brief keeps using the word reasonable about the response to the jury question, and I'd like for you to articulate as specifically as you can what state law you think was violated by the response. So interestingly, Your Honor, I think under the way that the people have presented the case on appeal, that's not even an issue the court needs to address. The people on appeal point to Boyd. Boyd doesn't look as to whether or not there is an entitlement to the instruction under state law or whether a state law is violated. It looks to whether the instruction actually given is ambiguous or misstates federal law. On this record, the answer no is clearly ambiguous or misstates seabird, because seabird says maybe. But going back to Your Honor's question, the issue of voluntariness, as I started, is one that under state law a defendant is entitled to an instruction on. Here, the jury's note asked for clarification as to how it was to assess the voluntariness of the subsequent statements on the unique facts of this case. And so I would submit to you as both Judge Lairberger and Judge McMahon found that on these facts there was an entitlement to the additional clarification under state law, because as a matter of state law, Mr. Hernandez was entitled to an instruction on voluntariness. So the question was not how. The question was whether. Whether, if we find that the confession that CCPO before the Miranda rights and so on, we must disregard. And whether is, well, as I think you alluded to, a no, yes, maybe does not necessarily require any elaboration. How would require an elaboration? Respectfully, Your Honor, I think that's an exceedingly narrow reading of the note. The note asks... That's the argument on the other side. But I think it's wrong, and I think it's been rejected for good reason, because the note in full asked the judge to explain to us whether, if we find the confession was not voluntary, we must disregard the two videotaped statements at CCPO. And the answer to that question is not no. Indeed, the people conceded below that if there was a finding that the initial statement was involuntary, then at bare minimum, Siebert would compel the suppression of the first video recorded statement, which came immediately in time afterwards. Indeed, on the Siebert issue, the facts here... But the question then is not involuntariness of the first confession. The question ultimately, I think the argument is, is about attenuation. But I think... Because I think you agree that if the third confession before the ADA, whose name I can't remember right now, before the ADA, comes in legitimately, then just as a matter of habeas, you lose. But maybe I'm wrong on that. I wouldn't go quite that far, Your Honor, because I do think there are aspects of the purported confession to ADA Durasanti that are meaningfully different and weaker than the first one. The recording with ADA Durasanti includes statements from Pedro where it's very clear he doesn't understand his rights. He doesn't really understand what's going on around him, and so a properly instructed jury might have considered that one differently. But I think the bigger question is whether a jury told that it had the ability to choose to regard or disregard the subsequent video recorded statements if it found that the first one was involuntary, would have considered either of them at all. And the trouble is, we just don't know, right? When I was arguing for the government, we always leaned very heavily on a properly instructed jury, and this jury was not properly instructed. Which do you want? We believe that habeas should be granted. We believe a new trial should be ordered. A new trial. So a conditional writ or release? What is it? Well, in my experience, the way this would work is if the court ordered a new trial, we would then be back before the state court arguing about bail. But we do believe a new trial is required. All we need to do is, according to you, is grant habeas and then let the state decide what it wants to do? Correct, Your Honor. Well, that's a conditional writ, more or less. Okay, thank you. Thank you, Your Honor. Do you reserve some time for rebuttal? Yes. We'll hear from Mr. Kress. Good morning. Good morning. Thank you, Judge Lohier. Stephen Kress. You don't have 35 minutes. Okay, 10 minutes. I'm glad I don't have 35 minutes, but thank you very much. Stephen Kress from the New York County District Attorney's Office on behalf of the respondent. I think maybe I'd like to start with the question that Judge Calabresi raised and that Judge Yolley picked up on as well in terms of the deference to the appellate division's harmless error argument. It absolutely deserves ad pedeference, and I think it's not tied into the finding that they made about this being a correct response to the note. The appellate division determined that assuming additional instructions should have been given, in other words, assuming that this no response was not good enough, whether under federal law or state law, any error in failing to give additional instructions was harmless. But how can we possibly say that something is independent, even if they say so, when they say it was no error? I mean, just psychologically, how can we say that a court says it wasn't wrong to bring these things in and then when asked if the error that was made with respect to it wasn't harmless? I mean, just I don't understand how somebody can say something isn't an error, and by the way, it's harmless anyway, without being influenced by the fact that they said it wasn't an error. I mean, I can't do that. I think courts rule in the alternative all the time, Your Honor. Yes, and much of the time it doesn't matter because the alternatives are sufficiently separated that you're really talking about two different things. But here the alternatives really deal with the same thing. Was it wrong to use a word like no, which is in some ways correct, though not quite as nuanced as could be, and then was it harmless? That is, here you don't have two alternatives that are out here. You have two alternatives that are intertwined. And maybe I'm wrong, but I've gone through this now several times, and I said if I answered no, would I then be able to say, oh, and by the way, it's harmless without being so anchored in that no that it follows from it? Okay, well, I guess I will question.  Yeah, I mean, it's an important question. That's why I asked it on the other side, and that's why I'm glad you attacked it. Oh, sorry. That was a question. Oh, I'm sorry. I thought I was getting a question from you. No, no, no.  Well, okay, so maybe, so as I understand it, the error that Mr. Hernandez sought to assign with respect to the appellate division argument was an error that was focused on the two confessions. The harmlessness analysis of the appellate division was focused on attenuation. So those are two separate, am I right about that? Those are two separate issues. And so maybe that is an answer to Judge Calabresi's question, but I don't know. No, I think you're absolutely right in saying that the appellate division's decision focused on, or its harmlessness ruling focused on attenuation. And they said that, I mean, look, the jury could have been given a CLE lecture on CYBIRT and on attenuation under New York law, and there is no way that they would have concluded that the statement to ADA Durastanti would have been beyond their consideration because it was not sufficiently attenuated, whether under CYBIRT or under New York law, and they overlap as to the second half of the CYBIRT analysis, which is the was there a substantial break in time and circumstance as part of it. I don't think there's any way to say that the jury would have concluded that that statement was beyond their consideration and that they would not have relied on it as tainted by the first one. And so I think, and you're absolutely right, Judge Lilly, if that statement is in, this case is over. I mean, that is a full and complete confession giving intimate details about this crime. And it is then corroborated by the statements that he makes to the doctors and also- How does it interact with the concern that he didn't understand his Miranda rights, right? I mean, there's a suggestion that the third confession would have come in no matter what. Is that really fair when part of the voluntariness includes a prong of knowledge? And that was exactly one of the questions that the jury had. It was, and that issue was litigated, and it was found that he validly waived his Miranda- Well, the question, of course it was litigated, and the jury ultimately, after debating for nearly a week, finally said one way. But the question of whether they were affected in that by the statement that was a blunt yes-no answer rather than a maybe answer is the question before us. Or would they have come to the same conclusion if they'd had a ciphered instruction, right? I mean, isn't that what we're discussing? Yes, I think if you're doing the harmless error analysis, I think you have to ask, would the result- or let me actually step back. Could any fair-minded jurist conclude that the result would not have been different had they been given an instruction on attenuation? And I just don't see how you could get there applying the factors that state courts use to apply attenuation or that in cyber, that there's a substantial break in time and circumstances. Now, just one question. Djibouti, who got that third confession, was there or heard the first two, did he not? He was there, yes, at the time. And that is something that might have been, could have been significant to a jury, wouldn't it? I mean, the degree to which you have the first one, then you have the second, which is simply a statement of the first, identical, and you have the third, and so the question is, was that one essentially prompted by somebody who knew the first two? But I think, Your Honor, when you're doing- Or was it independent? I think when you're looking at the second half of the cyber analysis, whether there's been a substantial break in time and circumstances, the point of that inquiry is to look at whether the defendant would appreciate the significance of the Miranda warnings that he received and could make a valid waiver. He didn't know, as best as we can tell, that ADA Durastanti was there at the CCPO. I mean, there are two parts. What this guy was doing in making it look like something new, and this guy's mind, which is another problem altogether, you know, what this guy understood, whether he understood anything, even if he had been given a Miranda warning is another matter, which isn't really before us, but which is part of the record. That is true, Your Honor. It's not before us, and I see I'm running low on time. I do want to make a few more points in response to my adversary. So voluntariness was before the jury, absolutely. Attenuation was not, and actually the First Department, the Second Department, the Fourth Department have all held that attenuation is not part of the voluntariness inquiry, and they've actually rejected defense requests for attenuation charges. Now, sometimes judges decide to give them, but so far the state of the law in New York is that you are not required to give an attenuation charge. So that's not part of the voluntariness inquiry normally before a jury. And attenuation, as opposed to was the defendant in custody and other aspects of voluntariness, that attenuation was not a focal point of the defense argument. They weren't arguing you should disregard these subsequent statements because they're tainted by the first one. So Mr. Discamp pointed us to a part of the, I think, defense summation at 1149 where this question was presented by the defense, and you're saying that's not correct. No, I don't think they were arguing that these were the— I don't think they argued, A, that this was the product of deliberate, intentional wrongdoing on the part of the police, or B, that a reason to disregard the subsequent statements is because they're tainted by the first, and those are two different— If we decide that it was error to say no, which is the first and big question, the lower court and the magistrate both were very clear on that, but that's an issue for us. But if we decide that there was error, realistically, can we just say with an error of that sort and the long debate after, can we say that this would not have had an effect? Isn't that the question? Can a reasonable jurist, assuming that now to have been error, because if it wasn't, that's not it, and how it was tried, everything else, the other confessions, can we say that this did not have an effect? Am I right in posing the question? So I would tweak it slightly, Your Honor. I don't think the question is can we say that a fair-minded jurist concluded it had no effect whatsoever. I think it's— No, no, not no effect whatsoever, but that it had an effect on the verdict. I think the question would be could a fair-minded jurist conclude this was harmless beyond a reasonable doubt, or in other words, that there's no reasonable possibility of a different outcome. And as I said before, yes, a fair-minded jurist could conclude that. I think because—and let me cite a case that this Court decided about a year ago. Judge Lowy was actually on this panel. It's Richardson v. Capra. It was another cyber case where— I have no memory of that case whatsoever. I happened to be arguing that one that day as well, Your Honor.  No, it's quite all right. I remember it pretty well. But the Court in that case determined the appellate division reasonably found there was no cyber violation because a videotaped statement to a prosecutor was sufficiently attenuated under cyber. And the facts in that case were far weaker on attenuation than the facts in this case. In that case— Can I ask, before he confessed to the DA, did anybody tell him that his confessions to the police were likely inadmissible? No, because I don't—they weren't inadmissible. But no, that's one of the ways that you can cure a cyber violation that Justice Kennedy mentioned. How about you just tell me what curative steps might exist? Curative steps would be a passage of time of 10 to 11 hours between the time that the questioning at the CCPO ended and the time he gives his statement to ADA Durastanti. Perhaps even more importantly, when ADA Durastanti starts the interview, he says, we're starting fresh. We're starting brand new. What does that mean? It means don't feel like you're bound by the statements that you made to the police. Okay, so I suggest a person with a very low IQ would have understood it to be that. I don't know how—I mean, yes, he's talking to a person with a low IQ, but he puts it in plain English. I mean, saying, we're starting new. We're starting over again. What do we make of the fact, then, that at the very end or near the very end of the interview, he asks again about counsel, which I think suggests a level of confusion about his right to counsel. I don't know that it suggests confusion. I actually think in some ways it shows that he understood that he had that right. But I haven't yet actually addressed a very important question, if I could have a brief time to do that, and that is whether or not this answer was actually correct. And again, remember, this was decided by the appellate division. So the question before this Court is, could any fair-minded judge have concluded that this answer was correct as a matter of Federal law? And if you look at the way the note is written, it can reasonably be read as asking, if we find the first un-Mirandi statement involuntary, does everything else after that— must we disregard everything else after that? The answer to that is absolutely no, unequivocally no, because there is no way you can argue, and I don't think my adversary could argue with a straight face, that the statements to the civilians, the doctors, would be suppressed under cyber or New York law. And so the answer, then, is do we have to disregard everything? The answer to that is no, it's not me. That's a very technical reading of the jury instruction, and I'm wondering if it's reasonable to impute that level of parsing to a jury. I think that is the most fair reading of their note, and I don't think it's overly technical. And again, the question is, could any fair-minded judge read it that way? Again, you're telling me that the jury would understand, and I would have thought an answer would have been, well, you certainly can take into account all of these statements that he made, whichever way they count, for or against. As to the other, that's a much more complicated. That is, what you're telling me is that a simple no, because it combines things as to which there's very great difference in the degree to which a jury might want to do, is doubly misleading, precisely because it includes things which, of course, they can take into account and things which maybe they can't or maybe even they shouldn't. So I'm a little confused about why you're making that argument, although, of course, it is the essence of what we have to decide. I think I'm making the argument because the question is, could any fair-minded judge read it the way the state courts did? And I think the answer is, yes, you can read it that way. Just look at the way it's written. It uses commas and it uses an and at the end. I'm sorry. Go ahead, Judge. Would you just address, so there's this idea that the response must be meaningful, right? Is that a state law requirement or standard? That's a state law standard. And then, of course, this is a federal law overlay. Can you just take me through that? Okay. How does it interact? So the Cup v. Naughton standard, which is, I think, the one that the district court tried to apply, there are cases where an error of state law could be so egregious that they rise to the level of constitutional violation. And I think that's essentially what the district court was saying. But the deference that this court owes to a state court's determination on state law is, if not completely binding, it's certainly incredibly deferential. And so I think— Because I think that what the district court did here, just looking at that, was to say that the appellate division got it wrong when it determined that the response was meaningful. So it second-guessed a matter of state law. That's correct, Your Honor. That's correct. And so I think that doesn't mean— What is the consequence of that? Because we're reviewing the district court decision in de novo. So there are many layers, right, as you know and as Mr. Discan knows. But what is the consequence of that if we think that that was wrong? In other words, if we think that the district court's reassessment of the meaningfulness was incorrect. So I think that blocks that path to habeas relief for the petitioner. So there's sort of three ways that a state court jury instruction can give rise to habeas relief. One is if the instruction misstates federal law. The second is the Boyd option, where it's so ambiguous that there's a reasonable likelihood the jury applied it in a way that violates federal law. And then there's this third option, which is it's so wrong under state law that it gives rise to a constitutional violation. So I think if you determine that the district court was wrong to second-guess the appellate division's ruling, and I would— But I'm sorry. Is that the first or the third then? That would be the third. So first is error of federal law. Second is ambiguous under federal law. Third is error of state law that is really bad and so prejudicial it gives rise to a constitutional violation. So I think if you determine that the district court was wrong to second-guess the appellate division, that falls away. And if I could just very briefly return to the first— Go ahead. The first point, I just want to make clear, we did not concede ever that the second statement— or excuse me, the videotaped statement at the CCPO would be suppressed simply because— like simply if the first statement was found to have been involuntary. Certainly if there is a cyber violation that was found, an intentional violation, then yes, I think the second statement then would have to be suppressed. But—and this is a very important point— the jury note asked if we find the first statement not voluntary. That doesn't mean a cyber violation. It could be not voluntary just based on a Miranda violation. And so that does not mean that under cyber, if you find there was a Miranda violation, that you then have to disregard the statement that came right after it. In that case, ELSTAD would apply, and I don't think you could argue that the second— or the videotaped statement was involuntary in the traditional due process sense, in the sense that it was coerced. I mean, he got Miranda warnings before it, and certainly questioning wasn't possible. So the view is that the cyber instruction was not necessarily in view of the reference to the involuntariness? That's correct. They were charged—you know, voluntariness was defined for the jury, and it was never—the deliberate aspect of it, which is the essential component of a cyber claim, was never included in that definition. And it wasn't—in our view, it wasn't argued to the jury. And so there's no reason to believe—I guess this actually ties into the second path here, whether there's any reasonable likelihood the jury misapplied it. It wasn't before them, and so to say that there is a reasonable likelihood they would have found a deliberate violation I think goes too far. And again, could any fair-minded juror say that there was no reasonable likelihood? And then really it's the—it goes back again to whether there was even a request or an argument to the jury during summation about a cyber-related issue. Right. And I would submit they're not—that was certainly not the focal point of their summation. I would even say the focal point of their summation was a third-party culpability defense. It wasn't even necessarily a tactical statement. Thank you. Thank you, Your Honor. So— Could you please start with the cyber versus Miranda distinction that he just mentioned? Certainly, Your Honor. You're talking about the people's position on the statement. So here's what they actually said. You know, what they said is if the petitioner had been subject to custodial interrogation before receiving Miranda warnings, it would likely require suppression of the statements both before and immediately after. That's the concession. That is, if there was a finding by the jury that the initial statement was involuntary, then it would require suppression of the statements that immediately followed because there's no plausible attenuation argument as to those. But nor is there a plausible argument as to attenuation as to the statements to 88 Durastanti. And I think as Your Honor's questions picked up on, it's a series of continuous events. He is taken from the seven hours of questioning to the site of the asserted crime where he's walked around there. He's taken to the DA's office where at 2 a.m. he sees Durastanti for the first time. He's given a brief period to sleep and offered something to eat. And then at 7 a.m. they turn the video recording on and start again. So some of the factors that courts look for in assessing attenuation are clearly not present here. There's no break in custody. There's no break in questioning. There's no specific notice to him that his prior statements are not going to come in. There's sorts of hallmarks of attenuation. If there were sufficient attenuation, how could you prevail? Well, if there were sufficient attenuation, it would still be a jury question, Your Honor. I mean, attenuation is just a variant on the theme of voluntariness, right? The concept of attenuation goes to whether or not the second or the third waiver of rights is voluntary. And to Judge Perez's question, you know, with a mentally disabled, not disabled, but certainly limited defendant, you know, that's something a jury can consider. And so the question was not whether the first department, as a matter of first impression, because there's no finding by the trial court of attenuation. The issue is not whether the first department can make that finding. The question is whether a properly instructed jury would have made that finding. We already know from the fact of the note itself that the jury was grappling with these issues and contemplating reaching a different outcome than the state court had reached on the issue of voluntariness. And that's fine. That is their prerogative under state law. And the problem is because the jury wasn't instructed, even that they had the option to consider this, they had no ability to do so. Judge Loyer, you had asked about whether this was argued to the jury. And I gave you a page range. I now have a more specific citation, which is A1143, A1143 to 44. And the specific argument, among others, is if you find Mr. Hernandez was in custody prior to the first recorded confession, then you must disregard the statements he makes to the police and what follows. He then goes on to talk about the improper conduct as something that can be considered by the jury in evaluating these statements. This was something that was directly argued to the jury, which is not surprisingly why the jury then had a question about it. I want to talk quickly, though, about some of the panel's questions about the issue of error and the notion of a meaningful response. And let me note again that if the panel adopts the way the people are arguing this case on appeal, then that issue becomes irrelevant. And there's no issue of edpedeference on the first issue at all because Boyd doesn't require it. Boyd simply asks whether the instruction as given misstates federal law. Here it clearly does. There is no plausible argument that the answer to this note is no. And, again, I submit to you you know that because Siebert says it's no. You admit to it because, Judge Perez, as we were just talking about, the people conceded below the answer was not no. It is maybe. And this jury under New York law was entitled to know that it was maybe, that they were allowed to consider if they found the first statement involuntary. As a direct matter of federal law, not as a matter of whether we interpret state law correctly or not. That's exactly right, Your Honor. That's exactly right. And I would submit to you that when you then move to the second issue of harmlessness, which we spent less time talking about directly, the issue of harmlessness weighs decidedly in favor of Mr. Hernandez. Both under Brecht, you know, as noted before, this court has addressed similar fact patterns on two recent occasions, and in both cases has found that the error was not harmless, that habeas relief was required. That's Wood, V. Eric Cole, and Ray V. Johnson. Under AEDPA, the question is whether any fair-minded jurist applying Chapman, putting the people to their burden of proving harmlessness beyond a reasonable doubt, could meet it. And I would submit to you that the answer to that is a very straightforward yes. No fair-minded jurist could reach that finding. The people could not prove beyond a reasonable doubt on a case in which the entire case rested on these videotaped confessions that a properly instructed juror. One juror, that's all it would have taken to reach a different conclusion. Thank you very much. Would have reached a different outcome. Thank you, Your Honor. This has been very helpful. This was very helpfully argued. Very well argued by both sides. Thank you very much. Appreciate it.